Good morning, your honors. Good morning. May it please the court. David Merchant. I'm with the Federal Public Defenders of Montana. Also, on behalf of Mr. Benitez-Valenzuela, I would reserve two minutes for rebuttal. I believe I also have the alligator in the bathroom in this case. This case turns on whether or not Mr. Benitez was seized. It is our intention that this was an investigatory stop. It's the government's position that it is a consensual encounter. For a consensual encounter to occur, there has to be consent. Otherwise, a police encounter with any individual is always going to be consensual. But a consensual encounter is a two-way street. In this case, the officer testified at the preliminary examination, and he also testified at the suppression hearing. Under the preliminary examination, Officer Pollack says, I approached Mr. Benitez because of their accent. There was no other suspicious activity. At the suppression hearing, Officer Holm, who is Officer Pollack's supervisor, testifies that, in fact, they did not hear them speak before they went to approach them. That these were the last two individuals off the bus, that they walked in together to the bus station, that they walked together through the bus station. They were conjugating together. Okay. On that first point about what they heard or didn't hear, if they had a right to go up and talk to him, regardless of whether he was speaking Spanish or not, it wouldn't make any difference, would it? Well, with all due respect, I disagree, Your Honor. I think that Border Patrol agents at the border have an unfettered right to talk to anybody they want to determine alienation. Outside of that border, they have to have reasonable suspicion. They have to have a reason to believe. Okay. I guess on that, unfortunately, there's two of these in a row, so it's not – it wasn't only one of them at the border. Correct. We had two at the same, you know, here in, I guess, in Montana. But I guess what you're saying is, if we determine that the Border Patrol agent's questioning of the appellant was not an investigatory stop, what grounds, if any, must an agent have to approach someone like the appellant, and what's your authority for it? Not what you want the law to be, what's your – I guess I don't understand the question. If you determine that it's not investigatory, that it's consensual? Well, in terms of it's – that it's not, you know, that it's not a terry stop, it's not – you know, it isn't approaching – you know, what can they do under the law as it exists? I mean, obviously, I heard in, you know, in the last argument, and I think that you were sitting there, I said, are you saying that officers can't talk to anyone? And they said, well, no, but you shouldn't have talked to him. And, you know, so are we going to say they can't talk to anyone on a train, or they can't talk to anyone here, or – But then you just said if they're at the border, at the Mexican border, then they can go in and talk to anyone. Well, actually, I believe – But I think if your case was at the Mexican border, you'd be making a different argument. So we've got to – you know, there – Well, I actually believe at the Canadian border. I'm from Michigan, and I know what the Sixth Circuit has ruled about border agents going into Detroit, and they do have a buffer zone where they're allowed to operate. But they can go up to anybody and have that casual, consensual conversation. Hi, how are you doing today? Pretty good weather. But this is not what happened here. What happened here is Agent Pollack goes up to Mr. Benitez, shows his identification. Mr. Benitez says that the badge is at his waist. Agent Pollack says he pulls the badge out of his coat, says, I am a Border Patrol agent, or I am an INS agent. Where were you born? That's not a consensual, casual conversation. People don't come up to me and say, hey, where were you born? They may say, wow, come on, desktop. That's right. But they don't ask me where I'm born. He is asking a question specifically to elicit an answer for his investigatory purposes, nothing else. The thing that bothers me in this case is that there is a factual difference between the preliminary examination and what happened at the suppression hearing. We have two different stories of what caused them to have their – What sort of factual findings do we have here by the district court? Well, that's also troubling. The district court rules – Well, it might be troubling, but is it also something that – it might be problematic, too. So that's – Well, I think it's problematic for everybody. That's what I want. Because the district court rules that the gunfighter pause amounted to reasonable suspicion. That when Mr. Benitez walked through the doors and, as Agent Pollack says, swung the batwing doors open and looked around and then proceeded in, that was indicative of somebody who was born not in this country but of a third world country. And he knew that from his training and experience. And that's why he approached him. The district court ruled that that was reasonable suspicion. Well, he went on, too, didn't he? Then he goes on and says that Mr. Benitez is free to leave. The problem with that is the facts don't support that because it becomes a credibility issue. And the court entirely dismisses Mr. Benitez's credibility. Now, the government had the opportunity – Okay, but wait. If it is – just play the devil's advocate here when you say these buzzwords. If it's a credibility issue and the district court resolved it as a factual dispute and they say he was free to leave, isn't that entitled to some deference? Typically, it is. But this court can look at the examination of that officer at the preliminary examination, the examination of that officer at the suppression hearing. It's disingenuous. He's either telling us one thing truthfully at the beginning or telling us truthfully at the other side of the coin after he has heard Agent Home give his testimony and fitting it to Agent Home's testimony of what was the reasonable suspicion that he went and stopped Mr. Benitez. The problem becomes, as Mr. Benitez testified, and he testified that he felt menaced by the voice and the actions of this officer that he didn't feel that he could continue on to the bathroom. The government had the opportunity to cross-examine Mr. Benitez, and they only cross-examined him on one point. How many people were in the bus stop? Mr. Benitez testified that he believed it was five or six. The agent retook the stand and said there were 18 to 20. That's it. They didn't ask him, well, how was it menacing? The government had the opportunity, and the district court simply did not take Mr. Benitez's word at all. And then the other troubling aspect of this is if you read the next paragraph of the opinion, it's because of September 11th. The government now has to do this because of September 11th. And quite frankly, I'm not sure what letter, period, comma, what changed in the United States Constitution on September 12th that we didn't have these aspects before September 10th, but on September 11th we now have to look at everybody with a suspicious eye. The problem becomes is consent. And the case law that you're asking me to support this on is, I'll go to Florida v. Royer, where it says that law enforcement officers do not implicate, much less violate the Fourth Amendment by merely approaching an individual on the street and asking him if he's willing to answer some questions. Asking him if he's willing to answer questions. The United States cites the U.S. v. Kim, and Kim is the same way. The DE agent, after he partially blocks in the person, goes to the window, identifies himself as a DE agent, and asks leave. Excuse me. He then requested leave to ask some questions. There's always that consent. And in this case there's not. Here's my badge. Where were you born? And the problem becomes is this is not a consensual encounter. This is an investigatory stop which requires some form of probable cause. Or excuse me, some form of reasonable suspicion. And the reasonable suspicion the Court finds, as a matter of law, is the gunfighter pause. Born in a third world country. Clint Eastwood is no longer an American citizen. Why don't we serve the balance? I do. Thank you. Good morning, Your Honors. My name is Anna Peckham, and I'm an assistant United States attorney in Great Falls, which is in the District of Montana, and I represent the United States in this case. The law in this case is fairly clear, and essentially law enforcement officers can approach people in public and put questions to them if they are willing to listen. It can be put questions to them. Put questions to them if they are willing to listen. Questions of identification. If the person they're asking is willing to respond, you're saying? If they're willing to listen. That's the language that I'm quoting from several of the cases. That's the terminology that they've used. But essentially they can go up and approach people and ask them questions of identification and alienage. And this principle is not just delegated to just along the border. This, under United States Supreme Court law and under Ninth Circuit law, United States VCAM, that's for anywhere in the country. And the principle is that they can ask them questions so long as a reasonable, innocent person would feel free to leave. So that's the standard. In this case, the initial encounter between Officer Pollack and Valenzuela was a consensual encounter. The reasons why Officer Pollack approached him, he didn't need probable cause, he didn't need reasonable suspicion, he didn't need any reason at all to go up and approach him and ask him questions. At the initial encounter, when he first approached him, he did show a badge, according to Officer Pollack. But under United States v. Drayton, showing a badge unto itself does not constitute a seizure. Also, if we look at the totality of the circumstances in this case, this occurred during daylight hours, approximately 11 o'clock in the morning. It was in public. It was at a bus depot in Billings. Officer Pollack was dressed in plain clothes. No firearm was brandished. No exits were blocked. Officer Pollack used no physical force or threats, didn't take him into a room, didn't back him into a corner. Also, the questions themselves were not threatening. He simply asked, where are you from? Where were you born? Could I see some identification? You know, there was a little thing in the transcript here about the record. When the fellow sort of wanted to go to the bathroom, whether it was Pollack, I think it was, got in his way and stopped him from doing that. What was the evidence on that particular point? Did he stop him? He didn't say, no, you can't go to the bathroom. But I think the evidence is he got in the fellow's way so the fellow could not proceed on to the bathroom. Am I wrong in that? No, it's a little unclear, actually. According to Valenzuela, he initially stopped as he saw Officer Holm stop his companion. And when he noticed that they were speaking cordially to each other, he then proceeded on or wanted to proceed on to the bathroom. And at that time, Officer Pollack then had stopped him and introduced himself. Whether or not Valenzuela ---- See, that's sort of different from the last case where the person stepped to the side. You know, if you step in front of someone, that's a little closer to inhibiting their exit. Perhaps. But, again, I would say to look at the totality of the circumstances, that if you're going to stop someone, you have to do something to get their attention. And perhaps he did step to the front or put out his arm or did something to actually get his attention. And Officer Pollack even said that sometimes he doesn't get people's attention and he doesn't know if people hear him. And sometimes he has to tap them on the shoulder and say, hey, you know, because sometimes they don't hear him. But that, again, in the totality of these circumstances, does not constitute a seizure. Well, it seems to me that probably your strongest argument here is, and I question the appellant about it, has to do with the factual findings in terms of the court seemed to find that he was free to go, right? Yes. All right. But what appellant is encouraging the court to do is saying, well, that just, you know, based on the conflicting evidence or the unreasonableness of it, it's just the fantastical evidence before the court. What is your understanding of the factual findings here and how they should be viewed by this court? Well, the district court did conclude that the defendant was free to leave. The district court was the one that was able to observe the demeanor of Valenzuela and Officer Pollack, their tone of voice as to their credibility, as to which story that the district court was going to believe. Is this what the district court said now on page 3? Defendants should have easily turned and walked away from law enforcement at any time during the course of the interaction as there was no physical force or show of authority that required the defendant to stay. But there was a show of authority. He's mistaken. Judge Siebel is mistaken there was no show of authority, wasn't there, because he showed him his badge. Well, a showing of authority. Is that a show of authority? Yes, it is, Your Honor, but it is a show of authority. Was that a mistake to say there was no show of authority? Under the law, in terms of how they define show of authority, and I've I'm talking about a finding of fact. That's an erroneous finding of fact, isn't it? Clearly, erroneous finding of fact that there was no show of authority. Literally, Your Honor, you're correct. There was a show of authority that he did show his badge. However, how show of authority is understood under the law is that it has to be a show of authority that would make a reasonable innocent person feel as if they couldn't leave. And under United States v. Drayton, showing of a badge does not constitute a seizure or does not constitute making someone feel as if they were not free to leave. So I believe that is It's a terminology of law, not a literal statement. Well, it depends on the other circumstances that accompany that showing of the badge, right? Yes, Your Honor. If there are any other questions from the panel, I will resume. Thank you for your argument. Thank you again for the additional time for rebuttal. The last case that you heard, the Border Patrol officers talked to everyone. One officer went from the beginning of the train to the end of the train talking to everybody. Another officer stood up. So in that case, he should lose. In your case, he should win. No. In this case, those officers stood at the bus stop and waited until everybody got off the bus and then went to my client. They individualized my client. They weren't throwing the net over the entire bus. But they went to my client. There must have been something that drew their attention. The totality of the circumstances is the guide for this court is whether or not a reasonable person is free to leave. And Judge Thompson said, you know, I don't believe that I would feel free not to answer that question. I wouldn't either. If an officer gets behind me as I'm driving my car, I automatically look to my speedometer to see if I'm doing something wrong. Always. I look to see I don't wear my seatbelt and I always put my seatbelt on because I am doing something wrong. In this case, these officers made a beeline to my clients, showed a badge. Where are you born? This is not a consensual, casual encounter. This is an investigatory stop. And the investigatory stop must be based on reasonable, articulable suspicion that criminal activity is afoot. The criminal activity that is afoot is the opening of the doors and looking around, getting off of a bus. And even Agent Holm, in his earlier testimony, said, you know, it was really unusual that somebody would look around when they walked into a bus station after sitting on a bus, the bus that came up from Denver. People will go to soda machines. People will go to the bathroom. People will go to a telephone. And they probably don't know where those things are. There, no firearm was brandished. Absolutely. But my client testified that he saw it, that he felt intimidated, that it was menacing. It's the totality of the circumstances. You can't individualize that he's not in uniform, that he shows the authority. But that's not enough. You have to look at everything. And in a mind's eye, my client is walking to a bathroom and somebody physically stops him. I played rugby in college, and my standing in front of somebody was a physical show of force. The fact that they had to walk around me, they had to walk around me. All right. You're in the red, so you need to wrap up your argument. Thank you very much, Your Honor. All right. Thank you for both of your arguments. This matter will now stand submitted. Thank you. Whatever you want to do. Either. All right. Calix Indian Tribe versus Federal Energy Regulatory Commission. Cases number 0373-225-0570391. All right. As you're getting set up here, I want to let both of you know, obviously you each have 20 minutes. So with all of you here, you don't each get 20 minutes. All right. Each side gets 20 minutes, so I want to remind you of that. So if you're going to split your time, let me know, and then I will give the time over to the other party. And I tend to be a little stricter on that, just because if
judges: Thompson, Tashima, Callahan